No. 39,463

ORA LAMBERT, *Appellee,* v. ST. PAUL FIRE & MARINE INSURANCE COMPANY, a corporation, *Appellant.*

(272 P. 2d 1110)

Opinion filed July 6, 1954.

*Robert J. Hill,* of Wichita, argued the cause and *Howard T. Fleeson, Homer V. Gooing, Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Gerrit H. Wormhoudt,* and *Theodore C. Geisert* all of Wichita, were with him on the briefs for the appellant.

*Richard Barrett,* of Pratt, argued the cause, and *George Barrett,* of Pratt, was with him on the briefs for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action on an insurance policy to recover for the loss of wheat destroyed by fire while binned on plaintiff's farm.

The action was filed December 17, 1952. The cause was submitted with consent of the court on the pleadings and stipulations. Appellant's answer admitted the first ten paragraphs of the petition. Parts of those paragraphs are contained in the stipulations. In order to avoid needless repetition we shall omit from our summary of the first ten paragraphs of the petition portions therof contained in the stipulations. Other portions of the petition, in subsance, are:

The policy was issued to plaintiff, owner of the grain, on June 17, 1952. The loss occurred July 29, 1952. The policy provided it insured the plaintiff:

". . . to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind ·and quality within a reasonable time after such loss, without allowance for any increased cost of repair or reconstruction by reason of any ordinance or law regulating construction or repair, and without compensation for loss resulting from interruption of business or manufacture, nor in any event for more than the interest of the insured. . . ."

The policy also provides:

"It shall be optional with this Company to take all, or any part, of the property at the agreed or appraised value, and also to repair, rebuild or replace the property destroyed or damaged with other of like kind and quality within a reasonable time, on giving notice of its intention so to do within thirty days after the receipt of the proof of loss herein required."

Proof of loss was made July 30, 1952. Defendant promptly inspected and determined the grain which was destroyed or materially damaged.

In paragraph 11 of the petition plaintiff claimed a balance due on the basis of $2.22 per bushel of wheat, that being the amount for which he would have been able to obtain a loan from the Commodity Credit Corporation had he applied for it. The only portion of the answer we need consider is paragraph 2, which reads:

"2. The defendant denies the allegations made in paragraph 11 of plaintiff's petition and on the contrary alleges that the correct sum due the plaintiff by reason of the allegations contained in plaintiff's petition is $5,199.64 and this defendant herewith confesses judgment for said amount."

In the reply plaintiff denied any new matter set up in defendant's answer which was inconsistent with plaintiff's petition.

The only new matter contained in the answer was the above paragraph 2. The parties entered into two stipulations. The first was:

"1. The plaintiff, Ora Lambert, is a resident of Pratt County, Kansas.

"2. The defendant, St. Paul Fire & Marine Insurance Company, is a corporation lawfully organized and existing under and by virtue of the laws of the State of Minnesota. Said defendant has qualified to transact business in Kansas and is engaged in business in Kansas. It has entered its appearance herein by counsel.

"3. Exhibit 'A' attached to plaintiff's petition is a true and correct copy of a policy of insurance issued to plaintiff by the defendant.

"4. On the 29th day of July, 1952, the plaintiff was the owner of 4,480 pounds of maize, 150 bushels of oats and 4,018 bushels 30 pounds of wheat, all of which grain was stored in bins located on plaintiff's farm.

"5. The defendant has waived all policy defenses and the sole controversy between the parties is the determination of the actual cash value of the property at the time of the loss. The parties have agreed that the cash value of the maize was $116.48 and that the actual cash value of the oats was $135.00.

Plaintiff contends that he is entitled to be paid the amount per bushel which he could have borrowed from the Commodity Credit Corporation, pursuant to the terms of the Agricultural Adjustment Act of 1938 and all amendments thereto. Under the terms of said Act plaintiff was eligible for one of two types of loans:

"(a) A farm storage loan which would have required plaintiff to provide suitable storage facilities meeting regular inspection standards until August of 1953 and thereafter for such length of time as might be prescribed by the Commodity Credit Corporation. On this type loan plaintiff would have received $2.22 a bushel. Plaintiff would have had the right at any time to pay off the loan and use, sell or otherwise dispose of said wheat.

"(b) The second type of loan service which plaintiff was eligible for was a loan against warehouse receipts. He could have delivered the wheat in question for storage and thereafter could have pledged the warehouse receipts as collateral for a loan to the extent of $2.09 per bushel. Plaintiff would have had the right at any time to pay off the loan and use, sell or otherwise dispose of said wheat.

"6. Under the terms of the Agricultural Adjustment Act of 1938 and amendments thereto a loan made upon either of the two bases above outlined would not have subjected the plaintiff to a deficiency judgment upon foreclosure of the collateral.

"7. Plaintiff had not arranged for either type of loan when the loss occurred.

"8. The cash market price for wheat at the point nearest to the location of the grain when the loss occurred was $2.02 per bushel. The reasonable hauling charge for said wheat was 3¢ per bushel. A sale of said wheat at the nearest market on the day when the loss occurred would have netted the plaintiff $1.99 per bushel.

"9. On June 18, 1952, Frank Sullivan, Commissioner of Insurance for the State of Kansas issued a directive to all insurance companies operating in Kansas in reference to the method of settlement of losses involved in this case. A true and correct copy of the directive is attached hereto marked Exhibit 'A.'"

In the directive, exhibit "A," referred to in the last above paragraph, the commissioner advised insurers in this state it had come to his official attention that some insurers were not making adjustments with owners on lost grain on the basis of their filings. That directive pertained to wheat lost in the field before it was harvested and also took into account the duty of a tenant to deliver the landlord's share to the elevator where the tenant had contracted to do so. It is not factually in point here.

Paragraphs 10 to 13, inclusive, of this first stipulation consist of four letters exchanged between counsel for plaintiff in the instant case and the commissioner of insurance in which the former called the commissioner's attention to plaintiff's instant case and also took issue with the commissioner's directive above mentioned.

We need not burden this record with copies of those letters. In them appellee's counsel advised the commissioner appellee's grain had been harvested and binned; they took the same position then as now, namely, that an insurer is liable to the producer of grain in the amount per bushel for which he might have obtained a government loan. The commissioner, in substance, stated insurance policies such as the instant one existed and had been interpreted by the courts long prior to the government price-fixing program and his opinion was based thereon; that if the insurer undertook to replace the destroyed or damaged grain, which it had the right to do under the terms of the policy, the insurer certainly would not be required to pay the amount the government agreed to loan on the wheat but could go into the market and pay the current market price for replacement grain of like kind; that he believed the policy required the insurer to pay to the insured the market price less the cost of delivery but that this was only his opinion and the interpretation of the policy was a matter for the courts to decide.

Paragraph 14 of the first stipulation reads:

"14. Under the administrative procedures of the Agricultural Adjustment Act of 1938 plaintiff could have substituted wheat of the same quality and quantity for the wheat which was destroyed and would have been eligible to have obtained either type of loan described in number 5 above."

The supplemental stipulation reads:

"1. The storage facilities owned by the plaintiff were suitable storage facilities to qualify for farm storage facilities under the rules and regulations issued pursuant to the Agricultural Adjustment Act of 1938 and all amendments thereto."

Thereafter, the supplemental stipulation contains lengthy copies of forms involved in applying for government loans, including copies of such instruments as the producer's note and supplemental loan agreement and the commodity chattel mortgage.

Under the issue before us we deem it unnecessary to include copies of these forms in the opinion. A provision which probably should be noted is that contained in the supplemental loan agreement which requires the producer, on maturity of the commodity loan note, to pay the note or deliver the grain at his own expense. It provides:

"(e) (i). Upon maturity of the note (i. e., the date specified therein or such earlier date as the Corporation may make written demand for payment), the note shall be satisfied by payment and/or by delivery of the commodity subject to the provisions of this section. If a producer desires to deliver the commodity to the Corporation, he should prior to maturity give the county committee which approved the loan written notice of his intention to deliver.

The producer shall bear any expenses incurred in connection with the delivery of the commodity to the delivery point shown in the delivery instructions issued to him, such delivery point to be, insofar as practicable, the customary shipping point of the producer, or, shall pay to the holder of the note any costs incurred by the holder as a result of such failure to deliver the commodity to the designated delivery point."

The sole issue before the trial court was the proper measure of damage. It rendered judgment in favor of appellee and assessed the damage at $2.22 per bushel of wheat, without deducting the cost of delivery.

It has been observed the parties stipulated only that appellee was eligible for the two specified types of loan. It was, however, also expressly stipulated he had not arranged for either type of loan. Appellee argues he intended to procure such a loan. The fact he may have intended to apply for one of the two types of loan at some future time, and we do not know which, manifestly would give him no present enforceable right to collect the "pegged" price even from the government itself at the time the wheat was destroyed. Surely his rights against the appellant insurer could be no greater than the rights against the Commodity Credit Corporation. The fact, if it be a fact, that most producers of wheat apply for loans under the Commodity Credit plan does not mean they are required to do so or that they necessarily will do so. Some of them do not. In passing it is interesting to observe if appellee had ever participated in the loan program there is nothing in this record to indicate it. That observation, however, is not of controlling importance now. Succinctly stated, we have here an action for damages by a producer of grain based upon the terms of his insurance contract in which action, for the measure of his damage, he relies on a contract with the government which he does not have.

Whatever this court might hold in the event the government had made a loan to appellee, on which we presently express no view, it is clear that in this case appellee must recover on the contract of insurance without regard to the amount of the loan he could have obtained from the government had it made such a loan.

The cost of delivery manifestly is an element in determining the value of the grain. The parties expressly stipulated the cost of delivery was three cents per bushel; the market price for wheat at the point nearest the location of the grain when the loss occurred was $2.02 per bushel and the wheat at the nearest market on the day the loss occurred would have netted appellee $1.99 per bushel.

In its memorandum opinion the court stated, "It may be remarked that apparently neither party has considered replacement." To be sure appellant, the insurer, may have waived its right, under the quoted provisions of the policy, to replace the grain. Assuming it did the question still remains, how much may appellee collect as damages under the policy? The policy provides the appellee is insured,

". . . to the extent of the *actual cash value* of the property at the time of the loss, *but not exceeding the amount which it would cost to repair or replace the property* with material of like kind and quality within a reasonable time after such loss. . . ." (Our Italics.)

Surely there could be no great difficulty, if any, in ascertaining what it would have cost the insurer to replace the grain within a reasonable time after the loss.

It is possible the parties intended by their stipulation that the amount at which the insurer might have purchased such grain was the same amount as they stipulated appellee could have obtained by selling his grain at the time. We, however, cannot assume that fact. It may be the appellant insurer would have been obliged to pay more for grain of like character than would have been paid for it had appellee sold it at the elevator. The evidence is not clear on that subject and we shall not speculate concerning it.

The judgment is reversed and the cause is remanded with directions to try the action in harmony with the views herein expressed.